## LAW *v.* BAKER and others.[1]

*(District Court, N. D. Illinois.   January 4, 1886.)*

1. COLLISION—MANAGEMENT OF VESSELS IN TOW.
    A tow was made up as follows: Libelant's schooner next to and astern of the tug; astern of the libelant, a second schooner; and astern of all, a third, that of the respondents.   The distance between the stern of the first and the bow of the last schooner was about 1,200 feet.   Each schooner had some portion of her sail set, but as the wind was light and ahead, the sails of all were trimmed flat aft.   A squall came up, and with it the wind increased and shifted, coming out on the starboard quarter of each of the vessels.   Libelant's vessel, by reason of the fact that her head-sails were down and her after-sails set, was forced up in the direction of the wind, but was prevented from going around by a counter-force, that of the hawsers, by which her bow was secured to the tug, and her stern to the second schooner in the tow, the latter vessel having in the mean while, in consequence of the squall, left her original position astern of the libelant, and had ranged up on her (the libelant's) port side.   The third schooner, that of the respondents, was cast adrift by the second, and collided with the first.   *Held* that, under the circumstances of the case, the collision was caused by no fault of the respondents, but by the negligence of the libelant, in having the vessel under after-sail only, whereby she became unmanageable.

2. SAME—LOOKOUT.
    *Held,* that the collision having been caused by the negligence of the libelant, the temporary absence of the respondents' lookout, not having contributed thereto, was immaterial.

3. SAME—CREDIBILITY OF TESTIMONY.
    *Held,* that the credibility of the testimony of libelant's crew with regard to the movements of respondents' vessel is much weakened by the fact that they were panic-stricken, and took to their boats as soon as respondents' vessel was seen heading towards them.

In Admiralty.

*W. H. Condon,* for libelant.

*Robert Rae* and *C. E. Kremer,* for respondents.

BLODGETT, J.   The libelant, as owner of the schooner Lizzie Law, seeks to recover damages sustained by the Law from a collision which occurred on the waters of Lake Huron on the night of June 8, 1882, between said schooner and the schooner R. B. Hayes, owned by respondents.   The admitted facts are that on the night in question the tug John Martin was proceeding down Lake Huron with the schooners Lizzie Law, W. S. Crossthwaite, and R. B. Hayes in tow, in the order named.   The course of the tug was about S. by E., and the wind about dead ahead, when the wind shifted to N. N. W., and a

---

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

squall came up, which resulted in putting the Hayes and Law into such positions relative to each other as to cause the collision.

It is claimed on the part of the libelant that the collision was caused by negligence on the part of the Hayes in not having a sufficient watch on deck to properly handle her in the squall; that the sails carried by the Hayes before the squall came up should have been taken in before the squall struck; that the Hayes, when struck by the squall, changed her course, and went off to the westward, and then changed her course to the eastward, and ran into the Law, as the Law was following astern of the tug; that the Hayes had no proper lookout; and that the collision occurred by reason of these changes of course, insufficient watch on deck, and want of proper lookout on the part of the Hayes.

The case was referred to the commissioner, who heard the proof, and finds by his report that the Hayes was at fault, and that respondents, her owners, are liable for the damages sustained by the Law. To these findings of the commissioner the respondents have excepted, and the questions of fact before the commissioner have been reargued.

The proof shows that the night was pleasant up to about half past 10 o'clock, with but little wind, and that from nearly the same direction in which the tug with her tows was running,—that is, about S., or S. by E.; that all the schooners in the tow had a part of their sails set, but trimmed flat aft, so as not to impede the tug; that the Law was towed directly astern of the tug, with about 500 feet of line; the Crossthwaite, directly astern of the Law, with about the same length of line; and the Hayes, with about the same line, astern of the Crossthwaite. The Crossthwaite being about 200 feet long, the distance between the stern of the Law and the bow of the Hayes would be about 1,200 feet.

It is difficult to determine from the proof, with even approximate certainty, just how much warning the officers and crew in charge of the decks of these vessels had of the approach of the squall. But it sufficiently appears that there was some warning or indications of a thunder storm gathering in the north-west, and the crews of all the vessels seem to have done something towards taking in part of their sails. All agree that the squall was of very brief duration, and not very heavy or dangerous at any time. It seems undisputed, also, that the Crossthwaite ran up and passed the Law on the Law's port side, so that at the time of the collision the Law lay off the starboard side of the Crossthwaite.

It is contended on the part of the respondents that when the squall struck them, the Law had taken down her forward sails, leaving her after-sails up, or part of them, so that when struck by the squall from N. W. or N. N. W., she broached to, or came up towards the wind so as to lie directly athwart the course of the Hayes, thereby causing the collision before the course of the Hayes could be sufficiently changed to avoid it. A careful study of the testimony satisfies me

that the head-sails of the Law were taken in, and the mainsail and part of her mizzen were up when the squall struck her, and that with these sails trimmed flat aft, and the squall coming from N. W. or N. N. W., the Law would naturally broach to or come up to the wind, the only force to prevent her from coming clear around being her tow-line attached to the tug; and with the Crossthwaite off to the eastward or port side, her tow line would naturally help to hold the Law in this position,—that of lying nearly broadside to the wind. The proof from the tug is, to my mind, quite conclusive that the Law did broach to, as is contended on the part of the respondent; and that, while she lay thus broached to, the lookout of the Hayes, when from 300 to 400 feet from her, saw her position, when the wheel of the Hayes was put to starboard for the purpose of keeping off and passing under the Law's stern, but they were too near to make this maneuver successful, and the collision occurred.

As to the alleged negligence on the part of the Hayes, the proof satisfied me that her head-sails were up and that her mainsail had been taken in before the squall struck her. With her sails in this position, she could not have gone off to the westward by the action of a N. W. or N. N. W. wind, unless her wheel has been put hard over to port, which was not done; that is, all the affirmative proof is that it was not done, nor ordered to be done, and there was no occasion for giving any such order. The proper thing for the Hayes to do under the circumstances was to follow, as nearly as she could, in the line of the other tows ahead of her, and this the officer of her deck and her wheelsman testify they endeavored to do; that is, they kept their course. For some unexplained reason the line of the Hayes was cast off from the Crossthwaite, but I do not see that this in any way affected or brought on the collision. Probably when the officer in command of the Crossthwaite saw that he must change his vessel's course to avoid the Law, which had broached to ahead of him, he also thought the line of the Hayes would embarrass him in swinging clear of the Law, and cast it off for that reason; but this is mere conjecture, as neither party deemed the matter of consequence enough to prove or attempt to prove why it was done.

As I gather the facts from the testimony, it seems improbable to me that Capt. Leith, of the Law, could have seen the Hayes off 1,000 feet to the westward of him, and then seen her change her course, and come stem on towards the broadside of the Law. It seems to me much more probable that the Law lay broached to in the pathway of the Hayes, and while her officers and crew were engaged in their effort to get her mizzen and main sails down, without being conscious of the direction in which the Law was heading, they saw the Hayes coming directly towards their broadside. If the Law had been heading to the south, as she was when struck by the squall, the Hayes must have been coming from the westward to have been seen coming directly toward the Law's broadside; but if the Law had broached to, as I

conclude she did, then the Hayes, without change of course, would be seen coming stem on to the Law's broadside.

The reliability of the testimony from the deck of the Law is much shaken, to my mind, by the fact that as soon as the Hayes was seen heading for the Law, her officers and crew took to their boats; and when the collision occurred, there was no one on the Law except a seaman who had been sent to the mizzen cross-trees to loosen the mizzen halyards that had got fouled there. The fact that these men fled so precipitately on the first appearance of danger certainly very much weakens their reliability as witnesses as to what took place, either on their ship or on the Hayes.

I therefore conclude that, at the time the collision occurred, the Law lay broached to in the course of the Hayes, and was held nearly stationary there by the action of the lines from her bow to the tug, and from her stern to the Crossthwaite, and that her broaching to was in consequence of the bad seamanship of her crew in taking off her jibs, and leaving on her mainsail and mizzen. All the proof concurs that the wind shifted to the north-west before the squall came up. A thunder shower was gathering in the north-west, and the premonition therefore was that if there was an increase of wind, it would be from that direction, and any seaman ought to have known that by taking off his jibs and other forward sails, he was putting his ship in an unmanageable condition, and all the testimony agrees that if the Law's head-sails were up, and her after-sails down, she would have been unmanagable, and would have broached to.

It is also urged that the want of a proper lookout on the Hayes contributed to this collision. The proof shows that the watch on deck consisted of the second mate, Wilson, and the wheelsman, and that Wilson acted as lookout. In a quiet night such as the proof shows this to have been, this would seem to have been a sufficient watch for a vessel in tow of a tug, as the Hayes was. The captain of the Hayes was disabled by a sprained or broken ankle, and as soon as the weather became threatening, the first mate was called, who came at once on deck, and he and the second mate lowered the mainsail, and it was fully down five to ten minutes before the squall struck her. As soon as the mainsail was down, Lawson, the mate, went forward as lookout, and remained there till the collision occurred, the second mate remaining near the wheelsman; and when the order to starboard the wheel came from the mate on his sighting the Law broadside to ahead of him, Wilson helped the wheelsman to promptly execute the order. I cannot see what could have been done by more men, if they had been on deck, than was done by these towards averting the collision. The movement of the Hayes through the water was probably accelerated by the wind, and the Law was seen by Lawson, acting as lookout, as soon as the mist or fog would allow, and more men on deck would not have seen her sooner. The Hayes was a logy, dull sailor, that did not respond promptly to her wheel, but not to such an ex-

tent as to make her a dangerous vessel towards others in a tow that was properly handled.

It is true that for a few moments while the second mate was calling the first mate, and while they were taking in the mainsail, the Hayes had no lookout; but this, it must be remembered, was before the squall struck her, and while all the vessels were in control of the tug, and in their proper places. With the squall, there seems, from the proof, to have come a blinding mist or fog, which momentarily shut these vessels off from sight of each other; and when this fog or mist passed by with the squall that brought it, the witnesses from the Crossthwaite and the tug saw the Law lying with her head to the westward of her, and the Hayes was approaching her from the direction in which the tow had been running, and the collision occurred. If the Law had not been broached to, it would seem hardly possible that the two vessels would have collided. What the testimony shows as to the sailing and handling qualities of the Hayes confirms me in the conviction that she did not shoot off to the west in a tangent from her regular course, and then as quickly change and come back towards the east, and collide with the Law, but her very dullness would have helped to keep her in place upon her course; while the Law, being a quick handler and carrying a large amount of sail for her size, would, with her head-sails off, and her after-sails set, come up in spite of her rudder by the action of the wind from the northwest. It therefore seems to me that no such fault can be properly charged to the Hayes as contributed directly to bring about this collision, and I feel compelled to sustain the exceptions to the commissioner's report, and to find the respondents in no way at fault for the damages sustained by the Law.

I may add that it seems to me the commissioner arrived at his conclusions by placing an undue weight upon the mere opinions of the witness Wilson, the second mate of the Hayes. When this witness testifies as to facts within his knowledge, he seems to me usually intelligent and accurate; but when he attempts to express his opinions as to whether the deck of the Hayes had a sufficient complement of men to insure her safe navigation, those opinions seem colored with some peculiar views of his own as to the number of seamen that every vessel ought by law to be compelled to carry. The commissioner has also attached, as it seems to me, undue weight to the statement of Fitzsimmons, one of the mates of the Law, that the mainsail of the Hayes was up when he came on deck, just before the collision. As this witness had no better opportunities for knowing this fact than several others who have that testified it was down, the mere fact that the deposition of this witness, which was taken by respondents after libelant had failed to take it, should not, as it seems to me, endue his testimony with any more character for truthfulness than if it had been taken by the libelants. In fact, I cannot see that the question whether the Hayes' mainsail was up or down is controlling; as, with

all her forward sails set, the mainsail alone, without aid from the rudder, would not have caused her to run off to the westward, as described by the captain of the Law.

I regret to be compelled to overrule the finding of the commissioner, as no one more fully than myself appreciates his painstaking analysis of testimony, and his usually accurate conclusions as to the facts of a case. The exceptions are sustained. The finding will therefore be that the collision did not occur by reason of the fault of those in charge of the Hayes, and the libel dismissed.